UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| WESLEY LOREN BURRAGE, | |
| Plaintiff, | Case No. 2:18-cv-00079 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| | Magistrate Judge Alistair E. Newbern |
| ANDREW M. SAUL,[1] Commissioner of Social Security, | |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

## REPORT AND RECOMMENDATION

This case was referred to the Magistrate Judge to dispose or recommend disposition of pretrial motions under 28 U.S.C. § 636(b)(1). (Doc. No. 4.) Now pending in this Social Security appeal is Plaintiff Wesley Loren Burrage's motion for judgment on the administrative record. (Doc. No. 13.) The Commissioner of Social Security has responded in opposition (Doc. No. 19), and Burrage has filed a reply (Doc. No. 20). Having considered those filings and the administrative record (Doc. No. 11), and for the reasons given below, the Magistrate Judge will recommend that Burrage's motion be granted in part, that the decision of the administrative law judge be reversed, and that the case be remanded for further administrative proceedings consistent with this Court's order.

---

[1]     Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Under Federal Rule of Civil Procedure 25(d), he is automatically substituted as the defendant in this action. Fed. R. Civ. P. 25(d).

## I.    Introduction

Burrage filed his first application for supplemental security income (SSI) under Title XVI of the Social Security Act on August 20, 2007, alleging that he was disabled as of that date. (Tr. 150.) After Burrage's application was denied initially and upon reconsideration, he requested a hearing before an administrative law judge (ALJ), which was held by video on November 5, 2009. (*Id.*) In a January 28, 2010 opinion, the ALJ found that, although Burrage suffered from degenerative disc disease and attention deficit hyperactivity disorder (ADHD), he could, with certain limitations, complete the full range of unskilled light work defined by 20 C.F.R. § 416.967(b) and therefore was not disabled. (Tr. 150–56.)

The Appeals Council granted Burrage's request for review and concluded that, among other things, the ALJ had erred by failing to consider a November 1, 2009 opinion of Burrage's treating physician, Dr. Jack Rhody, and had not adequately explained why Burrage's complaints regarding his pain and impairments were not credible. (Tr. 164–65, 577–80.) The Appeals Council remanded the case to the ALJ, who, after conducting another hearing, found Burrage disabled and entitled to SSI on September 6, 2012. (Tr. 173–78.) In finding Burrage disabled, the ALJ concluded that he suffered from chronic obstructive pulmonary disorder, osteoarthritis, pain disorder, and mood disorder and that Burrage was limited to performing sedentary work with restrictions on his ability to lift, stand, and sit. (Tr. 175.)

At some point in December 2013, Burrage was incarcerated and his benefits were terminated. (Tr. 68.) Burrage filed a second application for SSI on April 30, 2015, after his release, and again alleged that his disability began on August 20, 2007. (*Id.*) Burrage's application was denied initially and upon reconsideration, and Burrage requested a hearing before an ALJ. (Tr. 179, 196.) At the July 26, 2017 hearing, Burrage's counsel sought to introduce Dr. Rhody's assessment of Burrage's ability to do work-related activities, which Dr. Rhody had completed the

day before the hearing. The ALJ stated that he would consider whether to admit the assessment, reminding counsel of the general rule that evidence must be submitted at least five days before a hearing. (Tr. 91–93.)

In a January 17, 2018 opinion, the ALJ found that Burrage was not disabled. (Tr. 80.) The ALJ declined to consider Dr. Rhody's July 25, 2017 assessment, stating that counsel had not adequately explained her failure to obtain it at least five days before the hearing. (Tr. 69, 108–13.) The ALJ also concluded that he was not bound by the September 6, 2012 decision granting Burrage benefits because more recent evidence indicated that Burrage's condition had improved. (Tr. 75.) The ALJ made the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since April 30, 2015, the application date. (20 CFR 416.971 *et seq.*).

. . .

2. Since April 30, 2015, the claimant's "severe" impairments have been a discogenic back disorder status post surgery and a generalized anxiety disorder (20 CFR 416.920(c)).

. . .

3. Since April 30, 2015, the claimant has not had an impairment or combination of impairments that has met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

. . .

4. Since April 30, 2015, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for performing simple, routine tasks.

. . .

5. The claimant has no past relevant work (20 CFR 416.965).

6.  As he was born August 23, 1972, the claimant was 42 years old, which is defined as a younger individual not younger than eighteen or older than forty-nine, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited education with the ability to communicate in English (20 CFR 416.964).

. . .

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering his age, education, work experience, and residual functional capacity since April 30, 2015, jobs that the claimant has been able to perform have existed in significant numbers in the national economy (20 CFR 416.969 and 416.969(a)).

. . .

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 30, 2015, the date the application was filed (20 CFR 416.920(g)).

(Tr. 75–80.)

The Appeals Council denied Burrage's request for review on July 17, 2018, which rendered the ALJ's January 17, 2018 decision final. (Tr. 1.) Burrage timely filed this civil action on September 7, 2018, seeking judgment on the administrative record. (Doc. Nos. 1, 13.) Burrage argues that (1) this case should be remanded to the ALJ under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence; (2) the ALJ failed to give proper res judicata effect to the 2012 decision awarding Burrage SSI; (3) the ALJ failed to properly analyze Burrage's symptoms, including his allegations of pain; and (4) the ALJ should have adopted Dr. Rhody's 2009 and 2012 opinions in determining Burrage's residual functional capacity. (Doc. Nos. 13-1, 20.)

## II.    Review of the Record

The parties and the ALJ have thoroughly summarized and discussed the medical and testimonial evidence of the administrative record. Accordingly, the record will only be discussed to the extent necessary to address the parties' arguments in the analysis that follows.

## III.    Legal Standard

### A.    Judicial Review of Social Security Appeals

The Social Security Act governs judicial review of final decisions of the Commissioner of Social Security regarding an individual's entitlement to SSI. 42 U.S.C. § 405(g); *see also id.* § 1383(c)(3) (stating that the Commissioner's post-hearing final decision with respect to SSI is "subject to judicial review as provided in section 405(g) of this title"). Under sentence six of § 405(g), the Court can remand a case to the Commissioner for "additional evidence" to be introduced, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). The Act also authorizes the Court to review "any final decision of the Commissioner . . . made after a hearing" and "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing." *Id.* The Court reviews such a decision to determine whether it is supported by substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). "Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). When substantial evidence supports the ALJ's decision, that decision must stand even if the record could also support a contrary conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). This Court may not "try the case *de novo*, resolve conflicts in evidence,

or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). However, the substantial evidence standard does not condone "a selective reading of the record" and instead requires the ALJ to have considered evidence that "'fairly detracts'" from her decision. *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)).

The Court also reviews the ALJ's decision for procedural fairness. *Miller*, 811 F.3d at 833. "The Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Failure to follow agency rules and regulations therefore "'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Id.* (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). "The failure to comply with the agency's rules warrants a remand unless it is harmless error." *Id.* at 723 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004)).

### B.   Administrative Evaluation of Disability Claims

Burrage is entitlement to SSI if he can show that he has a "disability" as defined by the relevant law. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.905(a), 416.920(a)(1), (2). In the SSI context, "disability" means an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). An application for SSI "is effective for the month in which an individual is under a disability, but in no case earlier than the month in which the application is filed." *Bogle v. Sullivan*, 998 F.2d 342, 346 n.2 (6th Cir. 1993). Thus, "[t]he proper inquiry in an application for

SSI benefits is whether the plaintiff was disabled on or after [the plaintiff's] application date."

*Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

ALJs use a five-step analysis to resolve the question of disability:

> At step one, the ALJ must determine whether the claimant is engaging in substantial gainful activity; if the claimant is performing substantial gainful activity, then the claimant is not disabled. At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is "severe." If the claimant does not have a severe impairment or combination of impairments, then the claimant is not disabled. At step three, the ALJ must determine whether the claimant's impairment meets an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled. Otherwise, the ALJ will proceed to the fourth step, where the ALJ must assess the claimant's residual functional capacity and past work. If the claimant can still perform his or her past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the ALJ must determine whether the claimant can make an adjustment to other work at step five. If the claimant cannot make the adjustment, the ALJ will find the claimant disabled.

*Miller*, 811 F.3d at 834 n.6 (citing 20 C.F.R. § 404.1520(a)(4)); *see also* 20 C.F.R. § 416.920(a)(4).

Burrage bears the burden of proof through step four, but, at step five, that burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate [Burrage's] residual functional capacity and vocational profile."[2] *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). When determining the residual functional capacity (RFC), the ALJ must consider the combined effect of all the claimant's impairments in light of the medical and nonmedical evidence. 20 C.F.R. § 416.945(a)(2), (3).

## IV.    Analysis

Burrage raises four issues on appeal. He argues that (1) this case should be remanded to the ALJ under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence; (2) the ALJ

---

[2]    "An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations." SSR 16-3P, 2016 WL 1119029, at *11 (Mar. 16, 2016).

was bound by the 2012 decision awarding him SSI; (3) the ALJ failed to properly analyze his symptoms, including his allegations of pain; and (4) the ALJ should have adopted the 2009 and 2012 opinions of Dr. Rhody in determining his residual functional capacity. (Doc. Nos. 13-1, 20.) As explained below, the ALJ failed to properly analyze Burrage's symptoms and Dr. Rhody's opinions; those errors are not harmless and require remand. Burrage's other arguments are without merit.

### A.     Remand Under Sentence Six of 42 U.S.C. § 405(g)

Because a sentence-six remand for the ALJ to consider new evidence could render the other issues raised moot, the Court considers this argument first. *See Ranly v. Colvin*, No. 3:14CV00334, 2015 WL 6446096, at *5 (S.D. Ohio Oct. 26, 2015) (finding that remand under sentence six mooted plaintiff's other arguments), *report and recommendation adopted by* 2015 WL 7180930 (S.D. Ohio Nov. 16, 2015); *Adams v. Colvin*, No. 0:14-CV-1206, 2015 WL 875360, at *3 (D.S.C. Mar. 2, 2015) (considering request for sentence six remand before arguments pertaining to ALJ's error because a remand might moot the latter arguments). Burrage requests a remand for the ALJ to consider the following evidence: Dr. Rhody's July 25, 2017 medical assessment (Tr. 108–13); an affidavit that Dr. Rhody submitted on March 20, 2018, stating that Burrage's back problems have gotten "progressively worse" since 2012 (Tr. 27–28); an October 30, 2017 MRI (Tr. 87); a January 18, 2018 discogram (Tr. 58); and an April 25, 2018 diagnosis of radiculopathy (Tr. 11).[3] (Doc. No. 20.)

---

[3]     Burrage did not request a remand under sentence six of § 405(g) until his reply brief, which can amount to waiver of such a request. *See Greene v. Comm'r of Soc. Sec.*, No. 1:14-cv-278, 2015 WL 457738, at *9 (S.D. Ohio Feb. 3, 2015) (finding that plaintiff had waived request for sentence-six remand by raising it for the first time in his reply). However, the reason to find an argument raised for the first time in a reply brief waived is that the non-movant ordinarily will not have an opportunity to respond to the newly presented argument. *See Harrier v. Colvin*, No. 2:16-cv-11456, 2017 WL 2927629, at *2 (E.D. Mich. July 10, 2017) (explaining that the waiver rule ensures that the non-movant is not deprived of "'the opportunity to expose the weaknesses of [the

Sentence six of 42 U.S.C. § 405(g) authorizes the Court to remand a case to the Commissioner for consideration of additional evidence, but only if the evidence is "new" and "material" and "there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" 42 U.S.C. § 405(g). It is Burrage's burden to show good cause for his failure to introduce new evidence—including the results of "relevant examinations"—before the administrative hearing. *Merida v. Astrue*, 737 F. Supp. 2d 674, 684 (E.D. Ky. 2010). The fact that a medical report was prepared after the Commissioner's final decision does not, by itself, demonstrate good cause. *Id.* (citing *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)). That is because, "[i]n social security cases, medical treatment of claimants is often ongoing, even after a hearing decision[,]" and "[r]emanding cases every time there is a new, potentially material medical record would undermine finality, which is undoubtedly the rationale behind the 'good cause' requirement." *Ellison v. Colvin*, No. 3:14-cv-00710, 2015 WL 873293, at *7 (N.D. Ohio Feb. 27, 2015). Thus, to show good cause, Burrage must provide "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

Burrage has not met that burden here. Burrage explains that he waited until ten days before the hearing to request Dr. Rhody's assessment of his work-related limitations because he wanted that assessment to be as up-to-date as possible. Burrage's desire to introduce the most current medical evaluation is understandable, but it does not justify waiting until the eve of the hearing to schedule an appointment with Dr. Rhody, especially given that Burrage had seventy-five-days'

_____

movant's] arguments'" (alteration in original) (quoting *Martinez v. Comm'r of Soc. Sec.*, No. 09-13700, 2011 1233479, at *2 (E.D. Mich. Mar. 30, 2011))). Here, the Commissioner apparently anticipated Burrage's request for a sentence-six remand and argued against it in his response. (Doc. No. 19.) Because the Commissioner was not deprived of an opportunity to state his position, the Court will consider Burrage's argument for a sentence-six remand on its merits.

notice that the hearing would take place. As the ALJ concluded, such a last-minute approach to obtaining relevant evidence does not reflect diligence, nor does it amount to good cause. With respect to the remaining evidence, Burrage argues only that it did not exist until "**after** the hearing[.]" (Doc. No. 20, PageID# 1173 (emphasis in original).) But, as already established, that fact alone does not demonstrate good cause. *See Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (holding that "timing alone does not satisfy the 'good cause' requirement" (citing *Oliver*, 804 F.2d at 966)); *Elliott v. Berryhill*, No. 3:13-cv-01397, 2017 WL 998072, at *12 (M.D. Tenn. Mar. 14, 2017) ("Although the records were not available at the time of the ALJ hearing, Plaintiff fails to provide good cause for not acquiring this evidence sooner."); *Edwards v. Comm'r of Soc. Sec.*, 654 F. Supp. 2d 692, 701–02 (W.D. Mich. 2009) (finding that plaintiff had failed to show good cause where her only argument was that the evidence did not exist at the time of the hearing).

Burrage has failed to show that a remand under sentence six of § 405(g) is warranted. Accordingly, none of the new evidence Burrage cites in his motion—including Dr. Rhody's July 25, 2017 medical assessment—is considered in the following review of the ALJ's decision. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (holding that, "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision"); *Newsome v. Comm'r of Soc. Sec.*, Civil Action No. 13-14649, 2014 WL 5362456, at *8 (E.D. Mich. Sept. 24, 2014) ("The only context in which this Court may consider evidence submitted by [plaintiff] after the ALJ issued his decision is to determine whether it merits remand pursuant to sentence six of 42 U.S.C. § 405(g)."), *report and recommendation adopted by* 2014 WL 5362733 (E.D. Mich. Oct. 21, 2014).

### B. Res Judicata

Burrage argues that the ALJ erred by not giving res judicata effect to the September 9, 2012 decision awarding him SSI. Specifically, Burrage argues that (1) the ALJ erred in concluding that his conditions had improved since the 2012 decision awarding benefits; (2) the ALJ was bound by the 2012 decision; and (3) res judicata therefore should apply. (Doc. No. 13-1.) These arguments regarding the effect of the 2012 decision on Burrage's subsequent application are considered together in the following analysis.

Burrage relies on *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), to support his position. In *Drummond*, the Sixth Circuit held that, "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination" in adjudicating a subsequent application for benefits "absent changed circumstances." *Drummond*, 126 F.3d at 842. The Social Security Administration applies *Drummond* by honoring a prior finding regarding a claimant's entitlement to benefits "unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or ruling affecting the finding or the method for arriving at the finding." SSAR 98-4(6), 63 Fed. Reg. 29,771, 29,773 (June 1, 1998). In Burrage's case, the ALJ concluded that he was not bound by the 2012 decision awarding benefits because there was evidence in the record showing that Burrage's conditions had improved since 2012. (Tr. 75.) Burrage disagrees.

Since the ALJ's January 17, 2018 decision, the Sixth Circuit has clarified the *Drummond* decision and the scope of res judicata in the social security context. In *Earley v. Commissioner of Social Security*, the Sixth Circuit held that res judicata does not "prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in

prior proceedings." 893 F.3d 929, 931 (6th Cir. 2018). The court held that res judicata "only 'foreclose[s] successive litigation of the very same claim'" and does not apply when a claimant files a new application seeking "disability benefits for a distinct period of time[.]" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). In a case such as this one, where the ALJ's res judicata analysis predates the Sixth Circuit's decision in *Earley*, courts "have asked whether the ALJ, despite purporting to follow *Drummond*, gave the new evidence a fresh look." *Neal v. Comm'r of Soc. Sec.*, No. 18-10709, 2019 WL 2208555, at *9 (E.D. Mich. Jan. 31, 2019) (collecting cases), *report and recommendation adopted by* 2019 WL 1306162 (E.D. Mich. Mar. 22, 2019). If the ALJ did so in a way that comports with *Earley*'s holding, remand is not required. *Id.*

Res judicata does not apply in this case. In ruling on Burrage's first claim for SSI, the ALJ concluded that Burrage had been disabled from August 20, 2007, through September 6, 2012. (Tr. 173–78.) The relevant time frame for Burrage's second application is different: the ALJ found that Burrage was not disabled between April 30, 2015, the date the application was filed, and January 17, 2018, the date of the decision. (Tr. 68–80.) Because Burrage's second application concerns a "distinct period of time," the ALJ was entitled to conduct an independent review of the record, including the evidence pertaining to the period after the 2012 decision. *Earley*, 893 F.3d at 931. Burrage's argument that the ALJ was bound by the 2012 decision awarding him SSI is without merit.

### C.    Burrage's Symptoms

At the July 26, 2017 hearing, Burrage testified that his pain was, in that moment, "about a nine" on a scale of ten and that the medicine he takes eases his pain but never eliminates it. (Tr. 100.) Burrage explained that he can get up and move around for about three or four hours each day and that "[t]he rest of the time [he is] propped up in a recliner so [his] back [does not] bother

[him]." (*Id.*) He can stand for ten to fifteen minutes at a time before needing to change his position. (Tr. 102.) He also stated that he suffers from tremors that prevent him from writing. (Tr. 100.)

After citing the relevant regulations, the ALJ concluded that Burrage's "medically determinable impairments could reasonably be expected to cause his alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of [those] symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr. 77.) The ALJ provided the following analysis to support that conclusion:

> The claimant's statements about the intensity, persistence, and limiting effects of his symptoms are inconsistent. At the hearing, the claimant testified he did not do any lifting, yet the medical evidence refers to him moving furniture on April 5, 2017 and lifting his son twenty days later. Also, on December 1, 2015, the claimant told Dr. Rhody he had been working on his mother's car. Finally, the claimant testified he mowed his grandmother's lawn every two weeks.
>
> The claimant has made inconsistent statements about his activities. At the hearing, the claimant testified he could only be on his feet for ten to fifteen minutes and only three or four hours a day. On April 5, 2016, however, the claimant told Ms. Remsing, when he did not have his medications, he had been "trying to complete too many projects at the same time." On his Function Report-Adult form, the claimant indicated he both took care of his son and could not do so. At the hearing, the claimant testified his mother took care of his son, yet he also stated he was afraid to take his sleeping medication because he could not hear his son during the night. At the hearing, the claimant did not mention any chores other than folding laundry. On his Function Report-Adult form, however, the claimant indicated he could clean his home and cook a big meal every week. He also indicated he could shop in stores for groceries.
>
> The claimant has made inconsistent statements about his ability to stand and walk. Again, at the hearing, the claimant testified he could only be on his feet for ten to fifteen minutes and only three or four hours a day. He performed those activities, even though he indicated he could only walk fifteen to twenty feet before having to rest. Once again, however, on his Function Report-Adult form, the claimant indicated he could clean his home and cook a big meal every week. He also indicated he could shop in stores for groceries. The claimant indicated he used a cane, although he did so only when he wanted to do so; the undersigned notes, however, the medical evidence since April 30, 2015 very rarely, if ever, referred to him using a cane.

The claimant has made inconsistent statements about his ability to drive. On his Function Report-Adult form, the claimant indicated he could drive but did not drive for long because he might have a "black out [sic] spell." At the hearing, however, he testified one of his doctors told him not to drive for long because of back spasms. Again, on April 5, 2016, the claimant told Ms. Remsing, when he did not have his medications, he had been "trying to complete too many projects at the same time."

Since April 30, 2015, the claimant failed to keep several appointments with Ms. Remsing. At the hearing, the claimant testified he also received counseling from VBHCS, yet there is very little, if any, evidence he did so. The claimant had at least two case management assessments, yet each time he declined such services. Exhibit B37F, pp. 32-35 and 69-70.

(Tr. 77–78 (emphasis in original).)

Burrage argues that the ALJ's analysis of his symptoms focused exclusively on evidence that, taken out of the larger context of Burrage's medical history, discredited his testimony.[4] (Doc.

---

[4]     Burrage raises three other issues that are too undeveloped to be considered on the merits. Burrage argues that the ALJ erred by (1) failing to consider the combined effect of all of Burrage's impairments, including pain and (2) concluding that Burrage's impairments did not amount to disability under Listing 1.02. (Doc. No. 13-1.) Burrage also suggests, without citing any authority, that his benefits should have been reinstated when he was released from prison. (*Id.*) With respect to the first argument, Burrage does not explain which impairments should have been included in the ALJ's analysis or describe how the ALJ failed to consider Burrage's pain. As discussed below, the ALJ considered Burrage's pain and other symptoms in constructing Burrage's RFC but failed to analyze those symptoms properly. Burrage's second argument is also without merit. A claimant is disabled under Listing 1.02 if he suffers from major dysfunction of a joint "characterized by gross anatomical deformity . . . and chronic joint pain and stiffness" that involves either "one major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively" or "one major peripheral joint in each upper extremity . . . resulting in inability to perform fine and gross movements effectively[.]" 20 C.F.R. § 404, subpt. P, app. 1, § 1.02(A)–(B). Burrage's conclusory claim that he "meets the requirements of Listing 1.02" is inadequate. (Doc. No. 13-1, PageID# 1141.) The Court is not required to generate an argument in support of that claim on Burrage's behalf. *See Jenkins v. Berryhill*, No. 3:16-cv-699, 2019 WL 2180437, at *4 (E.D. Tenn. May 16, 2019) (finding that plaintiff had waived argument that he met Listings 11.17 and 11.19 where he had done nothing more than provide the requirements of each listing). Finally, it is Burrage's burden to demonstrate that his benefits should have been reinstated. *See Biley v. Comm'r of Soc. Sec.*, No. C 11-03905, 2012 WL 4808439, at *5 (N.D. Cal. Oct. 9, 2012). Burrage's unsupported, passing reference to reinstatement is insufficient to meet that burden, and instead amounts to waiver of the issue. *See Bailey v. Colvin*, No. 3:15-cv-00815, 2016 WL 4559972, at *7 (M.D. Tenn. Sept. 1, 2016) (collecting cases for the proposition that an undeveloped argument is waived), *report and recommendation adopted by* 2016 WL 572455 (M.D. Tenn. Sept. 30, 2016).

No. 13-1.) The Commissioner responds that the ALJ properly identified inconsistencies between Burrage's hearing testimony and the function report he completed on June 12, 2015, and that the ALJ's analysis was supported by substantial evidence. (Doc. No. 19.)

To determine whether an individual is disabled, an ALJ must "consider all of the individual's symptoms"—including the individual's own description of his or her impairments—and "the extent to which [those] symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016); *see also* 20 C.F.R. § 416.929(a). The ALJ must first decide whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce [the] individual's symptoms, such as pain." SSR 16-3P, 2016 WL 1119029, at *2 (Mar. 16, 2016). If so, the ALJ must analyze the "intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id.* Factors relevant to that analysis include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7; *see also* 20 C.F.R. § 416.929(c)(3).

An ALJ's findings regarding an individual's symptoms receive "special deference." *Biestek*, 880 F.3d 778, 788 (6th Cir. 2017) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, [the Court is] not to second-guess . . . ." *Ulman*, 693 F.3d at 714. However, the ALJ may not "cherry-pick[ ]" from the record to discredit the claimant's symptoms, *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013). Here, the ALJ's analysis of Burrage's symptoms overlooks significant evidence that supports Burrage's testimony. This error undermines the ALJ's analysis and calls into question the RFC that the ALJ ultimately adopted.

### 1. Lifting

Taken in context, the evidence that the ALJ found discredited Burrage's testimony regarding his ability to lift instead corroborates Burrage's description of his symptoms. The ALJ noted that the medical evidence included references to Burrage moving furniture, lifting his son, working on his mother's car, and mowing his grandmother's lawn and found those examples at odds with Burrage's testimony that he lets his mother do most of the lifting around the house. (Tr. 77.) However, in highlighting Burrage's physical activities, the ALJ omitted a critical detail: the reason those activities are included in the medical record is that they exacerbated Burrage's back problems and caused him to see Dr. Rhody for pain management. For example, on December 1, 2015, Burrage complained to Dr. Rhody of back pain after working under his mother's car. (Tr. 963.) Dr. Rhody noted that Burrage's lumbar spine was tender and diagnosed him with sprained lumbar ligaments and intervertebral disc degeneration. (Tr. 964.) Dr. Rhody prescribed Zanaflex and Ultram.[5] (*Id.*) Burrage returned to Dr. Rhody on April 5, 2017, complaining of lumbar pain

---

[5] Zanaflex "is a medication used to treat muscle spasticity due to spinal cord injury or multiple sclerosis." *Tizanidine*, Wikipedia, https://en.wikipedia.org/wiki/Tizanidine (last visited August 12, 2019). Ultram "is an opioid pain medication used to treat moderate to moderately

after moving furniture. (Tr. 959.) Dr. Rhody documented tenderness in Burrage's lumbar spine and a positive straight leg raise test at thirty degrees.[6] (*Id.*) Dr. Rhody diagnosed Burrage with low back pain and sciatica and prescribed more Zanaflex as well as Prednisone and Norco.[7] (Tr. 960.) Burrage saw Dr. Rhody again on April 25, 2017, after Burrage had lifted his son and been kicked in the back by his son during sleep. (Tr. 957.) Dr. Rhody found tenderness in Burrage's lumbar spine, diagnosed him with a strain of the lumbar tendons, muscles, and fascia, and prescribed Naprosyn, Zanaflex, and Norco.[8] (Tr. 958.) On May 16, 2017, Burrage complained to Dr. Rhody of back pain that radiated down his right leg after having mowed his grandmother's lawn. (Tr. 955.) Dr. Rhody again noted tenderness in Burrage's lumbar spine and a positive straight leg raise test. (Tr. 956.) Dr. Rhody renewed the diagnosis of low back pain and sciatica and prescribed Zanaflex and Norco. (*Id.*)

Given the injuries that accompanied Burrage's attempts at physical activity in 2017, his testimony that his mother now does most of the lifting around the house is not inconsistent. The

---

severe pain." *Tramadol*, Wikipedia, https://en.wikipedia.org/wiki/Tramadol (last visited August 12, 2019).

[6] "The straight leg raise, also called Lasègue's sign, Lasègue test or Lazarević's sign, is a test done during a physical examination to determine whether a patient with low back pain has an underlying herniated disc, often located at L5 (fifth lumbar spinal nerve)." *Straight leg raise*, Wikipedia, https://en.wikipedia.org/wiki/Straight_leg_raise (last visited August 12, 2019).

[7] Prednisone is a steroid used "to suppress the immune system and decrease inflammation[.]" *Prednisone*, Wikipedia, https://en.wikipedia.org/wiki/Prednisone (last visited August 12, 2019). Also known as hydrocodone/paracetamol, Norco "is the combination of the pain medications hydrocodone and paracetamol (acetaminophen). It is used to treat moderate to severe pain." *Hydrocodone/paracetamol*, Wikipedia, https://en.wikipedia.org/wiki/Hydrocodone/paracetamol (last visited August 12, 2019).

[8] Naprosyn "is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain, menstrual cramps, inflammatory diseases such as rheumatoid arthritis, and fever." *Naproxen*, Wikipedia, https://en.wikipedia.org/wiki/Naproxen (last visited August 12, 2019).

ALJ's consideration of certain activities without acknowledging the medical problems that they caused does not take into account the "[f]actors that precipitate and aggravate [Burrage's] symptoms" and the Administration's observation that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications . . . may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3P, 2016 WL 1119029, at *7, 8 (Mar. 16, 2016). "A longitudinal record of any treatment and its success or failure" is also relevant to the ALJ's analysis. The ALJ apparently did not consider that Burrage has struggled to manage his back pain for years, as documented by a June 2012 opinion in which Dr. Rhody stated that Burrage suffered from lumbar disc disease, persistent radicular pain, and musculoskeletal pain disorder. *Id.* at *6; (Tr. 712).

### 2.    Other Activities

The ALJ concluded that Burrage has made "inconsistent statements about his activities," but the nature of that inconsistency is not evident from the ALJ's opinion. (Tr. 78.) The ALJ contrasted Burrage's testimony that he "could only be on his feet for ten to fifteen minutes and only three or four hours a day" with Burrage's claim, during an April 5, 2016 appointment at Volunteer Behavioral Health Care System (VBHCS) where he was treated for anxiety, that he had been "trying to complete too many projects at the same time" when he was not on his anti-anxiety medication. (Tr. 1006.) Burrage rightly points out that there is no information in the record describing the projects that he was trying to complete or whether they included standing. (Doc. No. 13-1.) In the absence of such information, it is impossible to conclude that Burrage's efforts to complete projects conflicted with his statements regarding the amount of time each day that he could spend on his feet.

Nor did the ALJ explain how Burrage's statements regarding care for his son were inconsistent. The ALJ faults Burrage for stating, in his June 12, 2015 function report, that he "<u>both</u>

took care of his son <u>and</u> could not do so." (Tr. 78 (emphasis in original).) In response to a question about whether Burrage cared for anyone else, the person who helped Burrage complete the report wrote: "Yes, son, when [Burrage] has him, child runs wild. [Burrage] can[']t take care of him."[9] (Tr. 335.) Any tension in that response dissipates when it is reasonably construed as stating that, although Burrage is charged with the care of his son, Burrage cannot fulfill that duty alone. Burrage's hearing testimony is consistent with that reading: after the ALJ asked Burrage if he took care of his son, Burrage responded, "Well, I've got my mom to help keep up with him. I watch TV with him most of the time, and sleep." (Tr. 99.) Although it is true, as the ALJ states, that Burrage testified that he often does not take his sleeping medication because doing so might prevent him from hearing his son during the night, that statement is best construed as one of a concerned parent and not as indicating that Burrage has a greater ability to take care of his son than his other statements convey.

Finally, although it is true that the summary Burrage provided in the function report of the chores he is able to complete differs from his hearing testimony, that difference is marginal and explained by the fact that Burrage's back problems worsened during the time between the function report and the hearing. The ALJ noted that Burrage stated in his function report that he could clean his home, cook a big meal every week, and shop in stores for groceries. To the ALJ, that summary of Burrage's activities was more optimistic than Burrage's hearing testimony, which "did not

---

[9]    A.R. Johnson, a disability examiner employed by the Tennessee Disability Determination Service, helped Burrage complete the form. (Tr. 321–22, 341.)

mention any chores other than folding laundry."[10] (Tr. 78.) That inconsistency should not automatically render Burrage's testimony unreliable. As SSA regulations provide:

> [I]nconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

SSR 16-3P, 2016 WL 1119029, at *8 (Mar. 16, 2016).

Burrage's 2017 testimony and 2015 function report are best read together as reflecting such fluctuations in his symptoms' intensities—a reading that is consistent with Dr. Rhody's treatment records that Burrage's back condition had worsened during that period.

### 3. Standing and Walking

The ALJ's opinion does not adequately support the conclusion that Burrage "made inconsistent statements about his ability to stand [and] walk." (Tr. 78.) The ALJ repeated Burrage's testimony regarding the amount of time he could spend on his feet and cited the statement, from the function report, that Burrage could only walk fifteen to twenty feet before having to rest. Without explanation, the ALJ found that those statements conflicted with other parts of the function report, in which Burrage indicated that he could clean his home, cook a big weekly meal, and shop for groceries. Yet the ALJ highlighted those activities without providing important context from the function report: Burrage emphasized that he can only do those things slowly. Burrage stated that it takes him "forever" to clean the house, two hours to mow even "a small yard," between one and two hours to cook a big meal, and an hour to shop for groceries. (Tr. 336–37.) Burrage also emphasized that his back problems have interfered with his ability to spend time

---

[10]    In fact, Burrage also testified that, when he is not in pain, he is able to "pick up the bathroom[.]" (Tr. 99.) He also stated that, after he mows his grandmother's yard, she gives him money to buy things that his son needs. (Tr. 96.)

with his son, because Burrage "cannot move around fast." (Tr. 338.) Finally, it is true that Burrage

indicated in the function report that he uses a cane that he received post-back surgery "when he

wants" (Tr. 340) and that the recent medical records do not mention Burrage using a cane. But that

indicates, at most, that Burrage does not often want to use his cane, and the ALJ fails to explain

why that should detract from Burrage's other statements regarding the limitations on his ability to

stand or walk.

### 4.       Driving

The ALJ correctly found that Burrage has provided different explanations of his inability

to drive for extended periods of time. In the function report, Burrage stated that he cannot drive

for more than two or three hours because he might have a "black out spell." (Tr. 337.) At the

hearing, Burrage testified that his doctor told him to avoid driving long distances because Burrage

was having back spasms. (Tr. 99.) However, these different limitations on Burrage's ability to

drive are both supported by the medical record and are therefore not a basis to discredit Burrage's

testimony. Burrage suffered a head injury in 2003 and, since then, has experienced recurring

blackouts and dizziness (Tr. 433, 550, 639, 658). On June 25, 2013, Dr. Rhody noted that Burrage's

"[l]umosacral spine exhibited spasms of the paraspinal muscles." (Tr. 766.) Finally, the ALJ's

reference, again, to the fact that Burrage stated at the VBHCS that he was attempting to complete

too many projects when not on his anti-anxiety medication has no clear relevance to Burrage's

testimony regarding his ability to drive. It does not conflict with that testimony.

### 5.       VBHCS Appointments

Because Burrage did not receive treatment for his pain at VBHCS, the relevance of

Burrage's testimony about VBHCS to the ALJ's analysis of Burrage's pain is limited. The ALJ

found Burrage's statement that he received counseling at VBHCS inconsistent with the fact that

he had missed several counselling appointments and declined case management services, finding

"there is very little, if any, evidence" that Burrage received treatment. The record shows, however, that Burrage received counseling services on multiple occasions. (Tr. 1058, 1060, 1068, 1070, 1075.)

### 6. Consultants' Medical Opinions

Although the ALJ did not explicitly analyze Burrage's symptoms in light of the consulting medical opinions, the ALJ gave those opinions significant weight. The Court therefore considers them in its review. Dr. Terrence Leveck examined Burrage on July 2, 2015, diagnosing him with "[m]usculoskeletal low back pain, status post remote lumbar disc surgery without evidence of radicular pain on today's examination[,]" as well as ADHD and bipolar disorder. (Tr. 924.) Dr. Leveck opined that, during an eight-hour workday, Burrage could lift and carry twenty pounds occasionally, fifteen pounds frequently, and ten pounds continuously. (*Id.*) Dr. Leveck also opined that Burrage could stand and walk for eight hours with frequent breaks and could sit for eight hours. (*Id.*) Dr. Deborah Webster-Clair did not examine Burrage but, after reviewing his medical records on July 9, 2015, opined that, during an eight-hour workday, Burrage could lift or carry twenty pounds occasionally, fifteen pounds frequently, and ten pounds continuously; stand or walk for six hours; sit for six hours; and perform occasional postural activities. (Tr. 190.) On October 8, 2015, non-examining consultant Dr. James Millis offered an opinion regarding Burrage's physical limitations mirroring Dr. Webster-Clair's. (Tr. 208.)

The ALJ found that Dr. Leveck's opinion regarding Burrage's ability to lift was optimistic compared to the rest of the medical evidence, but nonetheless gave the opinion "great weight." (Tr. 78.) With respect to the opinions of Drs. Webster-Clair and Millis, the ALJ found that their proposed postural limitations were not consistent with Burrage's activities, but otherwise afforded their opinions "significant weight." (*Id.*)

The consulting physicians' opinions regarding Burrage's RFC are in conflict with Burrage's testimony regarding the amount of time that he is able to spend on his feet each day. Therefore, as the Commissioner argues, those opinions offer some support for the ALJ's decision to discredit Burrage's testimony regarding his symptoms. (Doc. No. 19.) However, the extent of that support is negligible when the consulting physicians' opinions are placed on a timeline with Burrage's more recent treatment with Dr. Rhody. All three consulting physicians offered their opinions within six months of the filing of Burrage's application in 2015 and therefore did not have an opportunity to examine the records associated with Burrage's repeated visits to Dr. Rhody for management of his back pain in 2017. As discussed above, those records support Burrage's allegations concerning his worsening symptoms and their limiting effect on his activities and call into question the more optimistic RFCs that the consulting physicians adopted in 2015.

The ALJ failed to explain how Burrage's testimony was inconsistent with the record and overlooked significant evidence that corroborated that testimony. In so doing, the ALJ failed to "consider all [of Burrage's] symptoms, including pain, and the extent to which [his] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. 416.929(a); *see also Gentry*, 741 F.3d at 726 (holding that ALJ had erred "[b]y ignoring the record evidence supporting [plaintiff's] complaints of pain, including the ones over a number of years made to her doctors from whom she received treatments with varying degrees of success . . ."). Substantial evidence does not support the ALJ's analysis of Burrage's symptoms.

### D. Treating Physician Opinions

On November 1, 2009, Dr. Rhody provided an assessment of Burrage's work-related limitations in which he opined that Burrage could occasionally lift less than ten pounds at a time; lift no amount frequently; stand or walk for about two hours in an eight-hour workday and for five to ten minutes without interruption; and sit for no more than four hours and for fifteen to twenty

minutes without interruption. (Tr. 577–78.) Dr. Rhody's assessment was based on Burrage's "[s]tatus post L4/5, L5/S1 right laminotomy and medical facetectomies; lumbar disc disease and persistent radicular pain; impaired gait; osteoarthritis, musculoskeletal pain disorder; bi-lateral upper extremities tremor, all evidenced by tests, surgical intervention, consultative and physical exams." (Tr. 577.) Dr. Rhody reviewed his November 1, 2009 assessment on June 5, 2012, and submitted an affidavit in which he stated that Burrage had been his patient since May 30, 2001; that "the limitations described in the [November 1, 2009 assessment] existed then and continue to exist;" and that "Burrage has suffered with back problems since 2004[,] . . . has failed back syndrome, with chronic and persistent pain[,] [and] [h]is prognosis is poor." (Tr. 710.)

In the January 17, 2018 opinion, the ALJ provided the following analysis of Dr. Rhody's opinions:

> The undersigned notes Dr. Rhody rendered an opinion about the claimant's physical capabilities on November 1, 2009. Exhibits 30F and B25F. His opinion, however, no longer appears valid when compared to most of the other evidence since April 30, 2015, including the claimant's activities. Hence, that opinion receives very little weight.

(Tr. 79.) Although the ALJ explicitly mentions only the 2009 opinion, he cites the document associated with the 2012 opinion, and therefore it appears that he considered both opinions.

Burrage argues that the ALJ should have applied the treating physician rule to give Dr. Rhody's opinions controlling weight.[11] (Doc. No. 13-1.) The Commissioner responds that the treating physician rule was rescinded effective March 27, 2017, and is therefore not applicable to Burrage's claim. (Doc. No. 19.) While the Commissioner is right that the treating physician rule

---

[11]    A treating physician is one who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.927(a)(2). The Commissioner concedes that Dr. Rhody was a treating source when he provided his June 5, 2012 opinion. (Doc. No. 19.)

has been rescinded, the rule still applies to claims like Burrage's that were filed before March 27, 2017, as the ALJ recognized in his opinion. (Tr. 77 (citing 20 C.F.R. § 416.927).)

The rule provides that, when the opinion of a treating physician concerning the nature and severity of a claimant's condition or RFC is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the ALJ must give that opinion controlling weight in his analysis. 20 C.F.R. § 416.927(c)(2); *see also Gentry*, 741 F.3d at 727 (holding that a treating physician's opinion concerning a claimant's RFC is also entitled to deference).The rule is based on the belief that a treating source's opinion is best able "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(c)(2). An ALJ may decline to adopt a treating physician's RFC, but only if the ALJ provides "good reasons" for that decision. *Id.* Those reasons must be "supported by the evidence in the case record[ ] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

In weighing a treating physician's RFC that has been deemed non-controlling, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source; and any other relevant factors. *Gentry*, 741 F.3d at 727; 20 C.F.R. § 416.927(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her

decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek*, 880 F.3d at 785.

The ALJ failed to provide good reasons for discounting Dr. Rhody's opinions. The ALJ did not describe the opinions in any detail, stating only that they concerned Burrage's "physical capabilities." (Tr. 78.) The ALJ then found that the opinions were inconsistent with "most of the other evidence since April 30, 2015," without providing any citation to the record. (Tr. 79.) The ALJ states that Burrage's "activities" appeared in tension with Dr. Rhody's opinions, but does not specify the activities in question or how they conflict with Dr. Rhody's findings. Although there is evidence in the record—such as the consulting physicians' opinions—that is at odds with Dr. Rhody's opinions, the burden of identifying conflicting evidence lies with the ALJ and not with the Commissioner or the Court. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (concluding that ALJ erred by not identifying the substantial evidence that was "purportedly inconsistent" with treating physician's opinion); *Adam v. Comm'r of Soc. Sec.*, No. 1:15-cv-501, 2016 WL 1545513, at *4 (W.D. Mich. Apr. 15, 2016) (finding that, although the Commissioner "may be able to identify portions of the record that support the ALJ's assessment [of a treating physician's opinion]," "such after-the-fact rationalizations" cannot constitute good reasons for discounting the opinion). Placing the burden on the ALJ "'ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.'" *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544). The ALJ's vague, one-sentence analysis of Dr. Rhody's opinions does not meet the treating physician rule's standard.

### E. Harmless Error

The ALJ failed to properly consider Burrage's symptoms and violated the treating physician rule. Such failures warrant remand unless they amount to "harmless error." *Gentry*, 741 F.3d at 723; *see also Ulman*, 693 F.3d at 714 (holding that "harmless error analysis applies to

credibility determinations in the social security disability context"). An ALJ's error in analyzing a claimant's symptoms is harmless "as long as substantial evidence remains to support [that analysis]." *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013). An ALJ's violation of the treating physician rule is harmless if:

> (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of [20 C.F.R. § 404.]1527(d)(2) . . . even though she has not complied with [its] terms . . . .

*Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)).

The ALJ's errors here are not harmless. In analyzing Burrage's symptoms, the ALJ ignored significant evidence that supported Burrage's testimony and repeatedly failed to explain his findings that Burrage's testimony was inconsistent with the record. Although the consulting physicians' opinions provide some support for the ALJ's decision to discredit Burrage's symptoms, those opinions were offered before Burrage's back problems intensified in 2017 and therefore do not amount to substantial evidence when considered with the record as a whole.

With respect to the ALJ's failure to provide good reasons for discounting Dr. Rhody's opinions, none of the above three factors is met. Dr. Rhody's opinions are not so deficient that the Commissioner could not possibly credit them—such a finding would be at odds with the Commissioner's decision awarding Burrage benefits in 2012, which was based, in significant part, on Dr. Rhody's June 5, 2012 opinion. (Tr. 176.) Further, although Dr. Rhody's formal opinions are from 2009 and 2012 respectively, nothing in the record since then would make those opinions impossible to credit—rather, those opinions are consistent with Burrage's testimony and Dr. Rhody's treatment notes from 2017. Nor did the ALJ adopt Dr. Rhody's opinions or make findings

consistent with them. The ALJ's conclusion that Burrage can perform light work—which involves "frequent lifting or carrying of objects weighing up to 10 pounds"—is in conflict with Dr. Rhody's finding that Burrage cannot regularly lift any amount of weight. SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983). Finally, the Court cannot conclude that the ALJ's perfunctory analysis of Dr. Rhody's opinions met the goal of § 416.927(c)(2).[12] That analysis is so brief and so vague that it does not permit meaningful judicial review. *See Johnson v. Soc. Sec. Admin.*, No. 2:16-cv-00026, 2018 WL 1508740, at *9 (M.D. Tenn. Mar. 27, 2018) (finding that the purpose of the rule had not been met where the ALJ's decision left the court "without a clear understanding" of how the ALJ analyzed the treating physician's opinion (quoting *Cole*, 661 F.3d at 940)), *report and recommendation adopted by* 2018 WL 1948126 (M.D. Tenn. Apr. 25, 2018).

## V.  Conclusion

For the foregoing reasons, the Magistrate Judge RECOMMENDS that Burrage's motion for judgment on the administrative record (Doc. No. 13) be GRANTED, that the decision of the Commissioner as it pertains to Burrage's application for SSI be REVERSED, and that the case be REMANDED for further administrative proceedings consistent with this opinion.

Any party has fourteen days after being served with this report and recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this report and recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party

---

[12]  Although the court in *Cole* cites 20 C.F.R. § 404.1527(d)(2) as the source of the treating physician rule in the context of applications for disability insurance benefits, *Cole*, 661 F.3d at 937, since the regulation's amendment, the rule has resided in § 404.1527(c)(2), *Kennedy v. Comm'r of Soc. Sec.*, 965 F. Supp. 2d 937, 942 n.1 (E.D. Tenn. 2013). 20 C.F.R. § 416.927(d)(2) governs SSI and contains identical language to § 404.1527(c)(2). *Compare* 20 C.F.R. § 404.1527(c)(2), *with* 20 C.F.R. § 416.927(c)(2).

who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 12th day of August, 2019.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge